The first case that we're hearing argument in is number 20-1708 Appaloosa Investment versus Federal Home Loan Mortgage Association and CW Capital. Mr. Redburn, are you there? I am. Good morning, Your Honor. Good morning, Mr. Redburn. You may proceed. I may please the court. Thomas Redburn from Lowenstein-Sandler for the appellant. There's a lot of briefing in this case, so I'm going to focus on four examples of errors by the district court that warrant reversal. The first one I want to talk about is the meaning of liquidation expenses within the gain on sale proceeds definition of the C-30 PSA. Liquidation expenses was not defined in the C-30 PSA. However, that doesn't excuse the district court's failure to interpret that language in accordance with its ordinary English usage and its ordinary plain meaning, which would be expenses incurred by the trust in connection with the liquidation of an REO property. Penalty interest and yield maintenance unambiguously cannot fit within the terms of that definition, within the ordinary meaning of that term. First of all, they're not expenses of the trust. Penalty interest and yield maintenance are amounts that are owed to the trust by the borrower in certain circumstances and are supposed to be paid to the trust under certain circumstances. Second, they don't have anything to do with the liquidation of the property. Penalty interest accrues— Let me interrupt for just a second, Mr. Redburn. I'm thinking about this. The theme of your papers has been that CWC as a special servicer shouldn't reap this windfall by using a definition with liquidation expenses that you don't agree with because it didn't have any skin in the game. It wasn't an economic participant, but your approach to liquidation expenses, to reading it in this ordinary but narrow way and potentially in some tension with the other documents, would also exclude the GSEs from participation. Sorry, I'm not sure what that's about. The yield maintenance and the government entities were clearly economic participants, your client. But doesn't your narrower reading of liquidation expenses wipe them out as well? It does under the plain meaning of the contract. Now, your honor is correct that from the perspective of the economics of the deal, the GSEs are not in the same position as CWC as a special servicer because CWC as a service provider never puts any capital at risk. The GSEs do put some capital at risk, although in the most super senior, most highly rated tranches of the deal. But the difference is their principle and interests were fully repaid. Yield maintenance is first and foremost a means of discouraging the borrower from prepaying or there's no borrower to incentivize. And so from that perspective, yield maintenance is no longer from the perspective of the trust. Yield maintenance is no longer serving a valid economic purpose, in which case it was perfectly rational for the drafters to decide that in the event of a large gain, a windfall gain on a property, which is particularly a black swan event like this one, for that money to go to the certificate holders who have money at risk and who have already incurred realized losses in the deal. Mr. Redmond and Byrne, let me ask you about the liquidation proceeds section 3.02. Even if we took your narrow definition of liquidation expenses, why doesn't that provision conflict with that? It mentions specifically penalty interest and yield maintenance charges. It says nothing, absolutely nothing about gain on sale proceeds, and it incorporates the REO loan definition, which also does the same. So why doesn't that at a minimum create ambiguity such that we should go to the strings of evidence? It doesn't create ambiguity because it fails to read the contract as a whole. What you have are two separate distribution mechanisms. You have 3.02b, which accounts, takes care of money that is coming in on mortgage loans, including from the sale of an REO property. But you have a special distribution mechanism that originates in section 3.04e of the PSA, which provides that upon the disposition of an REO property, where there is a gain, the special servicer is obligated at that point to calculate the gain on sale proceeds in accordance with a very specific and reticulated definition that appears in section 1.01 of the PSA, which clearly would not allow for a deduction of either penalty interest or yield maintenance from the liquidation proceeds in terms of calculating gain. There is no provision where there is a priority set forth that would reference gain on sale proceeds in the same context as the penalty interest or yield maintenance premium, right? Nothing. Except, Your Honor, that the interpretation of the PSA that has been advanced by CWC and the GSEs is that what gain on sale proceeds was intended to do was simply to serve as a catch-all. In other words, that any money that is left over after everything else is paid under section 3.02b goes to the certificate holders as gain on sale proceeds. Given the very specific and reticulated provisions on gain on sale proceeds, which clearly contemplate that that amount is calculated goes well beyond whatever is left over at the end of section 3.02b, it's actually their construction that doesn't have any support in the contract. Because if it were really the case that the gain on sale proceeds provisions were added in originally to the C4 PSA in 2003 in order to provide for this catch-all concept, whatever's left over, the way to do that would have been to insert at the bottom of 3.02b an additional step that says anything that hasn't been paid or hasn't been allocated for in previous versions of the allocation scheme are gain on sale proceeds. They go to certificate holders or to include a definition of gain on sale proceeds in the PSA that accomplishes the same thing. The drafters didn't either. What they did instead was impose an unfettered obligation in section 3.04e for the special servicer to segregate the gain on sale proceeds upon the disposition of an REO property and create it in accordance with the definition and created a definition of gain on sale proceeds that doesn't allow for payment of penalty interest, doesn't allow for payment of yield maintenance charges. I think you're putting the language of 3.04e very broadly. I just, I don't see, I don't read into it as much as you're reading into it, I guess. But can you just move to the extrinsic evidence, assuming we disagree with you and that it is ambiguous, that they seem to have, as the district court noted, strong extrinsic evidence in their favor. And I'm curious what, it doesn't seem that your experts point to any extrinsic evidence on your side. Sure, your honor. So the way I would answer it is twofold. The reason that the district court came to that conclusion is she basically disregarded the extrinsic evidence that had been put forth by the appellants. Let me put it two points on the scale. On the appellant side, what we had, what we presented was, first of all, an interpretation that harmonized all of the provisions of the contract, whereas theirs did not. Two, we put in expert testimony, both from a CMBS expert and a Chicago-trained economist, about the reasonable expectations of certificate holders in this type of deal, such that the reasonable expectations of certificate holders would be that the parties who are putting capital at risk benefit from the gains because they're the ones that suffer from the losses. It makes no sense to give a windfall game to a service provider who's already working on a fixed fee and has no money at risk. Third, we put in an expert report from a CMBS expert on the meaning of liquidation expenses. She looked at 94 PSAs that had been drafted by the same law firm, Cadwallader, that drafted the C-30 PSA, and all of those PSAs define liquidation expenses the same way, as the reasonable, out-of-pocket costs incurred in liquidating property. Correct me if I'm wrong. I don't think your experts say anything about whether the gain of sale proceeds provisions were added to the PSA to displace penalty interest or yield maintenance charge. I understand what you're saying about definitions of expenses, but on this issue of priority, I don't think that they opined on that in a way that's favorable. If you can correct me if I'm wrong. I believe that Ms. Hambly, your honor, and Mr. Berman, although Mr. Berman was offered only as a rebuttal expert, both opined that their understanding based on their experience in the industry was that gain on sale proceeds were intended to offset gains against losses, which precludes the payment of penalty interest when you have a windfall gain in an REOG. But they didn't point to anything in the industry to support that. The other side points to 247 times out of 249 where it has gone their way. But there are two problems, at least two problems with that, your honor. First of all, the transactions they pointed to did not give rise to a fixed and invariable custom and practice because there were two counterexamples where C3, your honor, I see my time has expired. Please take your time to respond to Judge Bianco. Thank you. I appreciate that, your honor. But that evidence did not generate a fixed and invariable custom and practice because there were two counterexamples where C3, who was a widely respected special servicer in the industry, paid gain on sale proceeds ahead of penalty interest and yield maintenance, which goes to a more fundamental problem with that evidence, which is what Mr. Greenspan's actually showed was that special servicers did the same thing irrespective of the language of the particular contracts that were governing each of those deals. PSAs are not uniform. There are standard provisions, but there are also a lot of variability. And particularly in this area, with respect to gain on sale proceeds, there's a lot of variability. Special servicers completely ignored that. Thank you, Mr. Redburn. Yes, no problem. Thank you, your honor. Thank you very much. We'll hear from Mr. Johnson for the GSEs. Thank you, your honor. May I please report Christopher Johnson on behalf of both Fannie Mae and Freddie Mac. There are two issues relating to GSEs, and this court should affirm the judgment with respect to both. On the first issue, the district court correctly held that the PSA is ambiguous because it contains conflicting terms. So yes, the PSA does contain terms such as those described by Mr. Redburn relating to gain on sale, but those provisions do not stand alone. Section 3.02B clearly says that liquidation proceeds defined there to include cash amounts received from an REO disposition should be applied to amounts due and owing under the mortgage note, including yield maintenance and penalty interest. That directly conflicts with any gain on sale provisions, and that creates the ambiguity. On the second issue, the district court properly resolved that ambiguity in the GSEs favor by holding that the undisputed extrinsic evidence proved that the GSEs are entitled to yield maintenance. Appaloosa had a complete failure of proof regarding yield maintenance. Their opening brief barely mentions the concept. The reply brief then tried to avoid the issue by grouping CW Capital together with the GSEs, but each of the five arguments that they make is false insofar as yield maintenance is concerned. First, they argue that the district court took sides in a battle of experts. There was no such battle here because Appaloosa's experts said nothing about yield maintenance. Ms. Hambly only offered a legal interpretation of the PSA that Appaloosa has abandoned in this appeal. Dr. Hartsmark, the Chicago-trained economist, meanwhile, offered an opinion based upon his mistaken understanding that the purpose of yield maintenance is to discourage refinancing, which is exactly what Mr. Redburn said, repeating that mistake. Mr. or Dr. Hartsmark, at his deposition when I showed him the amended notes for this mortgage loan, the first time he had seen those amended notes, he admitted that his opinion was not correct. Second, Appaloosa, when he says it was not correct, that means that what Mr. Redburn just told you about it is also not correct. Second, Appaloosa argues that the extrinsic evidence of custom and practice is not fixed and variable. This is false as to yield maintenance. The GSEs identified 45 REO dispositions that showed yield maintenance getting paid ahead of any gain on sale, and Appaloosa could not identify a single transaction that went the other way. In addition, we had industry participants who testified that this is the way it is done. Yield maintenance gets paid first. Third, Appaloosa argues that CMBS investors were not aware of the custom and practice regarding payments from REO sales. This is false as to yield maintenance. As their expert, Ms. Hambly, admitted, regular monthly remittance reports reflected any yield maintenance paid from REO dispositions. Fourth, Appaloosa argues that realized loss reports reflecting the allocation of REO proceeds were not available to CMBS investors. This is false. The record reflects that Fannie Mae was able to obtain such a report simply by proving that it was a certificate holder in the trust. Fifth and finally, Appaloosa argues that special servicers acted in a self-interested manner to pay themselves penalty interest. This has no application at all to yield maintenance, which special servicers paid to certificate holders like the GSEs, not themselves. In short, as I said, Appaloosa had a complete failure of proof regarding yield maintenance. The district court properly granted summary judgment to the GSEs and this court should affirm. Thank you. Thank you, Mr. Johnson. Mr. Cross. Good morning. May it please the court. Greg Cross on behalf of CW Capital. There was nothing unusual about the distribution and allocation of proceeds from the Stuy Town sale other than the amount of the proceeds. Discovery confirmed that proceeds were allocated and distributed just as they had been done with respect to every other loan in this trust, every other loan in the 33 WBCMT trust, and frankly, every other loan, the 100,000 loans that preceded it in the CMBS industry because we surveyed every single one of them. That's why on the eve of the sale, every industry publication forecast that the liquidation proceeds would be distributed exactly as they were. That's why. Could you pause, though, and respond just generally to the argument made by Appaloosa that, and this is a non-textual argument, but that in fact that the servicer was performing a relatively circumscribed duty and seeks to gain a windfall here that really wasn't anticipatable and that the documents impose no cap on the payment of penalty interest, that it's in the servicer's own interest to interpret the document this way, and there's only these junior certificate holders to fight back who were excluded from the documents. It's a very strange thing as an economic matter to have a non-economic participant in the transaction reaping such huge benefits. To the extent there's ambiguity in the documents, we have the extrinsic evidence, and the district court, of course, gave a very thorough review of those, but what about that just general basic concern about what that leads to here as a result? It's actually the reverse, Your Honor. This loan transfer to special servicing, it was worth $1.8 billion. The easiest outcome for the special servicer was to just simply foreclose and sell at that point, netting a net loss to the trust of $2 billion. That would have been the economically easy way to go and to reap a windfall. Instead, the special servicer worked the asset from the time of transfer in 2009 all the way through the date of disposition at the end of 2015, investing hundreds of millions of dollars to reposition the property, settling the largest tenant dispute in New York, which had plagued the property and dragged down the value, and getting through the hurricane. Now, let me finish on this. The party reaping the windfall is Appaloosa because Appaloosa wasn't an original investor. They bought in eyes wide open after the fact for cents on the dollar. They're the ones seeking the windfall, and they've already received one because they got the $50 million. CW Capital earned every penny, and the document is structured exactly as it is because CW Capital only could get paid after all the certificate holders had been paid in full. The incentive, the carrot, is you're going to get default interest, but you can only get default interest if we've been paid in full. The incentive was to do exactly what occurred here, work the asset, get the investor's money back, get them paid in full, which CW Capital did, and then you receive the default interest. Yes, it's a lot of money, but everything associated with the deal is a lot of money. The sale price for this asset was the single largest sale price for any commercial real estate parcel in the history of the United States, and that's out of a default. This is a situation where the property was crippled, burdened with litigation, and we were on the eve of, we could have lost billions of dollars, and instead, CW Capital turned it into a significant win. It's just a convenient retrospective look at history to characterize it as a default. Now, I want to address the fact, because there's a little confusion on liquidation expenses. There are two different ways that the judge found that CW Capital was correct. This is a traditional structured finance deal. It's governed by the waterfall. The waterfall is very clearly 302B. It provides that your maintenance and default interest are to be paid fifth in line, and then you pay the other amounts, whatever else is owing, and you determine the gain and you distribute that gain. If this court determines that 302B governs, liquidation expense definition is irrelevant. What the court said was that even under Appaloosa's focus on the definition of gain on sale proceeds, that if liquidation expenses included penalty interest and yield maintenance, well, then they lost that way too. In fact, all the discovery and all the evidence, just as with everything in this case, pointed to the fact that that's exactly what the industry does. In fact, the realized loss forms that are prepared by the master servicer and the special servicer on every liquidation include penalty interest and yield maintenance as part of liquidation expenses. Mr. Cross, let me ask you, you said something in response to Judge Carney's question that I just wanted to follow up on. You said they entered this, Appaloosa entered this, eyes wide open, I think you said. I just want to go to this issue of industry customs evidence. You did point to the fact that you believe that the law combined the non-party with respect to what the course of performance was in the industry custom at the time, and then you say, but they knew anyway, or should have known. They say all that evidence was much later on down the line. Was there evidence that at the time that they became involved here that they knew about this industry custom that you pointed to? Well, what we know is before this action was filed, they reached out to C3 and the president of C3 sent them realized loss forms and said, this is the way it is done. And those realized loss forms showed penalty interest being paid ahead of gain on sale. And that was the time they got involved in this. They bought after the market, they were not an original investor. So my comment on they came in with eyes wide open is they came in eyes wide open that the property was undervalued and that they were buying into a distressed asset. I was going to ask if you could get to the penalty interest. So the last bit here, which might be 67 million dollars, it seems to me there's a decent argument that various sections, but including 3.12, require that the penalty interest and the late payment charges have to be reimbursed. And so I guess explain to me what I'm missing here, why it is that there isn't at least a smaller amount of money that goes to Appaloosa for the penalty interest. Well, Appaloosa already received 50 million dollars or their portion of the 50 million dollars. But 3.11d says specifically that there's no netting. If interest on advances is paid first and reimbursed first, there's no artificial deduction or netting from penalty interest. That's picked up in 3.11d and 3.04. The argument that they're pointing to is Section 305 of the PSA. Here's the way it goes. 3.02 is the waterfalls. 3.04 sets up the accounts and 3.05 authorizes a master servicer to withdraw monies to pay things in the waterfall. But the important piece, and what Judge Vela correctly noted, was penalty interest is never deposited into the certificate account. And the provision that they're pointing to is a withdrawal from the certificate account. CW Capital receives all the money and it only puts money into the certificate account to pay interest on advances to the extent it's not otherwise previously reimbursed. And in this circumstance, since everything was paid in full, there was no reason to put the money in. So to give you an example, if there were... Can I continue? My time is up. May I finish my answer? You may. To give you an example, if there were an asset that had a $12 million debt, $10 million of principal, $2 million of interest, and the property sold for $12 million, $2 million of default interest, and the property sold for $12 million, the money would be deposited. The master servicer would come back and say, well, because on the trust books, we've advanced. We have interest on advances that have not been recouped. We have $1 million of interest on advances in addition to the amount showing on the borrower's loan. So what would happen in that circumstance? CW Capital would take $1 million of its default interest and pay in because there was not sufficient money to pay principal, to pay interest, and pay interest on advances. But in this circumstance, it's the reverse. In this circumstance, they recovered $15 million. So when the money was deposited into the certificate account, there was more than enough to pay the $1 million of interest on advances, the $10 million of principal, and for CW Capital to recover its $2 million of penalty interest and then to return an additional $1 million or $2 million, in my hypothetical, to the certificate holders like Appaloosa. So that's the reason it's there because occasionally there is a shortfall. And if you use the word previously, there could have been, Judge Solomon, there could reach back historically and say, well, these monies were repaid out of cash flows from the property, but that language prevents it. But they have no evidence on that point. And Mr. Greenspan surveyed all the loans again, and 88% of the time across the industry in the history of CMBS, it was done exactly like this. There is no artificial deduction unless there's a very specific netting provision that is not present in this PSA. Appaloosa came forward with no evidence on that point. Absolutely none. They have no industry evidence to contest Mr. Greenspan. Ms. Hambly did not contest her. She could not find a single mistake in Mr. Greenspan's analysis or recounting of the loans. So it stands unrebutted that that's the way it's applied. Thank you, Mr. Cross. Thank you. We'll hear rebuttal. Thank you, Your Honor. Picking up on that point at the end first, what 3.05A9 of the PSA says explicitly is that when you have unreimbursed interest on advances and in 311D additional trust fund expenses, those amounts are to be reimbursed first out of penalty interest collected in the same collection period in which they are reimbursed, unless in 311D those expenses have previously reimbursed, which unless the English language means nothing, has to mean reimbursed in a prior collection period. So when you have a situation like you did in Stuytown here, where they're unreimbursed interest on advances and additional trust fund expenses, and they are being reimbursed with the proceeds of the same transaction that is being used to pay penalty interest, there has to be an offset. 311D specifically says that the special servicer has to transfer that penalty interest to the certificate account in order to reimburse those expenses. Mr. Cross is simply misreading the language of the deal. Redburn, they say you have no extrinsic evidence on that point. What's your response? I beg your pardon? They say you have no extrinsic evidence at all on that point. What's your response? Because the language isn't ambiguous. I mean, this is not something where there was much exploration and discovery about extrinsic evidence. Our position all along has been you don't get to extrinsic evidence because the language of the contract on this point is elusive. The other point I want to pick up on is Mr. Cross's allegation that penalty interest somehow gives the special servicer an incentive to do a good job and to maximize the value of the property. There are three things wrong with that in this deal. First of all, the special servicer already has a legal obligation. It's called the servicing standard under the PSA to when a property goes into special servicing, the special servicer's, again, clear obligation is to maximize the recovery on that loan or that property for certificate holders. They don't need an additional incentive to do that. They already have a legal obligation to and if they don't, they face suit from certificate holders. Second of all, in this particular deal, the only information in the record on the change in value of the property is Dr. Hartzmark's expert report, which states that the property appreciated in value because the New York real estate market came back, not because of anything that CWC did. And with that, I see my time has expired. Thank you, Your Honor. Thank you very much. Thank you all. Well argued. We will reserve decision.